**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI**

| | | |
|---|---|---|
| **TWANNA HENRY,** | ) | |
| **Individually and on behalf of** | ) | **CLASS ACTION COMPLAINT** |
| **all others similarly situated,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.    4:20-cv-01865** |
| | ) | |
| | ) | |
| **VANTAGE CREDIT UNION,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **EH, LLC** | ) | |
| **d/b/a HONDA OF FRONTENAC,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **ERIC ACREE, JERRY EICHHOLZ,** | ) | |
| **DAN DOLAN, MARK RUDOLPH,** | ) | |
| **BARBARA EVANS-CUNNINGHAM,** | ) | |
| **DANIEL ISOM, TONI MARTIN,** | ) | |
| **WILLIAM SOLOMON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

NOW COMES the plaintiff, Twanna Henry, on behalf of herself and all others similarly situated, and respectfully submits the following Class Action Complaint and Demand for Jury Trial, and in support thereof states, upon information and belief, as follows:

**INTRODUCTION**

1.    Defendant Vantage Credit Union (Vantage") is Missouri's third largest credit union providing banking services to more than 77,000 members and with assets totaling $986.61

1

Million as of October 22, 2020.[1]

2.      As a member-owned financial cooperative providing financial services including savings, loans and other financial services to members, Vantage and its Board of Directors ("Director Defendants") are governed by the rules and regulations of the Missouri Credit Union Act, Mo. Ann. Stat. Chapter 370.

3.      Upon information and belief, Vantage enters into secret written agreements with certain auto dealerships ("Vantage Dealers"), which includes Defendant Honda of Frontenac. These secret agreements are authorized by Vantage's Board of Directors and specifically allows Vantage members to be charged interest rates higher than the rate determined by Vantage based upon the credit qualifications of the member.  Increasing the interest rate generates additional profit for both Vantage and the dealer, which is known in the industry as "Dealer Reserve."

4.      By contracting with dealers to charge inflated interest rates, Vantage, Vantage Dealers, and Vantage Directors routinely breach duties imposed on them by the Missouri Credit Union Act, engage in unfair and deceptive practices, and violate the Federal civil racketeering law by secretly increasing member's interest rates above the rate for which they qualify.

5.      Vantage members have no knowledge that they were actually approved for a lower interest rate than the one presented to them by the Vantage Dealer.

6.      These marked-up interest rates permit Vantage to profit at the expense of its members through the use of interstate wires and/or emails.

7.      The conduct of Vantage and its Directors also results in unequal and discriminatory treatment of specific Vantage members when compared to members who contract directly at a Vantage branch.

---

[1] https://www.creditunionsonline.com/credit-union-9459.html

8.     Yet, Vantage never discloses to its members who finance their vehicle purchases through a Vantage Dealer that they could have obtained a lower interest rate had they simply gone directly to Vantage for financing.  And, it never discloses that it offers better interest rates to Vantage members who obtain financing directly through Vantage.

9.     On its Website, Vantage even encourages its members to apply for loans at the dealership by stating: "Take the drudgework out of buying a new or used vehicle—use the Vantage Indirect Dealer Network! The network is a group of nearly 150 local automotive dealers who not only have their inventories online, but where you can also apply and close on your Vantage Credit Union auto loan when you're ready to buy."[2]

10.     By ignoring its responsibility to disclose all material information to its members and not to discriminate against certain members in favor of others, Vantage causes members who obtain financing through a Vantage Dealer to pay hundreds or even thousands of dollars more in interest over the life of their loans.  But due to the secrecy of Vantage's agreement with participating dealers and its policy of not disclosing the lower Buy Rate for which the member was actually approved, Vantage's members remain completely unaware that the interest rate presented to them by the Vantage Dealer was arbitrarily increased above the interest rate determined by Vantage based upon the credit qualifications of the member.

11.     Plaintiff Twanna Henry fell prey to this scheme when she purchased a vehicle from Defendant EH, LLC d/b/a Honda of Frontenac ("Honda of Frontenac") on December 5, 2013. As a result of this secret "dealer reserve" markup, Plaintiff ended up with an interest rate of 10.08%. And because Ms. Henry's interest rate was secretly and unfairly inflated, she ultimately paid much more over the life of the loan than she would have had she been offered the interest rate for which Vantage actually approved her.

---

[2] https://www.vcu.com/save/direct-dealer-network

12.     She brings this lawsuit on behalf of herself and others similarly situated for violation of the Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020 ("MMPA"), breach of fiduciary duties under the Missouri Credit Union Act, and unjust enrichment to recover the excess payments that she and other putative class members were forced to pay as a result of Vantage's unscrupulous conduct.

## JURISDICTION AND VENUE

13.     Court has jurisdiction over this action pursuant to the Class Action Fairness Act 28 U.S.C. § 1332(d), because there are at least 100 Class members in the proposed Class, the combined claims of proposed Class members exceed $5,000,000, exclusive of interest and costs, and at least one Class member is a citizen of a state other than Defendant's state of citizenship. This Court also has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. §1367. This Court also has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. §1367.

14.     This Court has personal jurisdiction over Vantage because it is incorporated and maintains a principal office in this state.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because most of the events or omissions giving rise to Plaintiff's claims occurred in this District and Defendant is subject to personal jurisdiction in this District.

## PARTIES

16.     Plaintiff Twanna Henry is a natural person residing in Normandy, Missouri, and had a direct consumer relationship with Vantage and its Directors as a member of Vantage. Plaintiff's December 5, 2013 purchase of a 2012 Dodge Challenger from Honda of Frontenac was a purchase for personal, family or household purposes and involved in trade or commerce

4

under Mo. Ann. Stat. § 407.010. The 2012 Dodge Challenger was merchandise under Mo. Ann. Stat. § 407.010.

17.     Defendant Vantage Credit Union is a Missouri corporation with its principal office in Bridgeton, Missouri ("Vantage") and is a resident and citizen of Missouri. Vantage is a person under Mo. Ann. Stat. § 407.010.

18.     Defendant EH, LLC d/b/a Honda of Frontenac is a Missouri LLC, with a principal office in St. Louis, Missouri, and is a resident and citizen of Missouri. Honda of Frontenac is a person under Mo. Ann. Stat. § 407.010.

19.     Defendant Eric Acree is a natural person residing in Missouri. He is the President/CEO of Vantage.

20.     Defendant Dr. Jerry Eichholz is a natural person residing in Missouri.  He is the Chairman of the Board of Directors of Vantage.

21.     Defendant Dan Dolan is a natural person residing in Missouri. He is the Vice Chairman of the Vantage Board of Directors.

22.     Defendant Mark Rudolph is a natural person residing in Missouri. He is the Secretary/Treasurer of the Vantage Board of Directors.

23.     Defendant Dr. Barbara Evans-Cunningham is a natural person residing in Missouri. She is a member the Vantage Board of Directors and on the Supervisory Committee for Vantage.

24.     Defendant Daniel Isom is a natural person residing in Missouri. He is a member of the Vantage Board of Directors.

25.     Defendant Toni Martin is a natural person residing in Missouri.  She is a member of the Vantage Board of Directors.

26.    Defendant Dr. William Solomon is a natural person residing in Missouri. He is a member of the Vantage Board of Directors.

27.    Vantage, the Director Defendants, and Honda of Frontenac's acts and practices occurred in connection with the sale or advertisement of any merchandise in trade or commerce in the state of Missouri, as defined in the Missouri Merchandising Practices Act, Mo. Ann. Stat. § 407.020 because Vantage advertised for financing and actually financed vehicles in Missouri.

## FACTUAL ALLEGATIONS

### A.    VANTAGE'S STATUTORY DUTIES

28.    Vantage is a Missouri state-chartered, not-for-profit cooperative designed to meet the credit and savings needs of its members. Vantage proudly states on its website: "Our members guide our mission and our vision. As a not-for-profit financial cooperative, we aren't seeking to make money—instead, our goal is to provide the best services and support for our members. But it's not just that our 'members come first,' they actually own the credit union and they lead it."[3]

29.    Vantage and the Director Defendants are governed by the rules and regulations of the Missouri Credit Union Act, Mo. Ann. Stat. Chapter 370.

30.    The Missouri Credit Union Act requires that Missouri state-chartered credit unions, like Vantage, and the Director Defendants, owe the following statutory duties to their members:

> **Sec. 370.005. Definitions**
> (1) "Credit union", a not-for-profit corporation organized for the purposes of encouraging thrift among its members, creating a source of credit at a fair and reasonable rate of interest, **providing for the mutual benefit and general welfare of its members with the earnings, savings, benefits, and services being distributed to its members, for financial and financially related**

---

[3] https://www.vcu.com/articles/vantage-_member-owned-member-led_

**services, and for an opportunity for its members to improve their economic and social conditions.** (emphasis added)

**370.200. Duties of board — telephone or electronic participation at meetings. —** 1. **The board of directors shall have the general management of the affairs, funds, and records of the corporation**, and unless they shall be specifically reserved to the members or delegated to the president or operating manager, it shall be the special duty of the directors:

(1) To act upon applications for membership in the credit union;

(2) **To determine, from time to time, rates of interest which shall be charged on loans;**

(3) To fix the maximum number of shares which may be held by and the maximum amount, both secured and unsecured, which may be loaned to any one member, such limitations to apply alike to all members; and

(4) To have charge of the investment of funds of the credit union, other than loans to members, and to perform such other duties as the members may, from time to time, authorize.

2. Additionally, the board shall have the duty to:

(1) Authorize the employment and compensation of the chief executive officer;

(2) Approve an annual operating budget for the credit union;

(3) Declare dividends on regular shares;

(4) Accept and act upon resignations and determine and fill vacancies on the board of directors, credit committee, and, if the bylaws so provide, the supervisory committee until the election or appointment of qualified successors;

(5) Amend the bylaws except for those provisions in other sections of this chapter specifically reserved for membership action; and

(6) Consider an appeal of a person denied membership by the credit union.

(emphasis added)

31.     As a result of the duties imposed under the Missouri Credit Union Act, Vantage's Board of Directors are responsible for the affairs, funds, and records of Vantage as well as determining the rates of interest to be applied on all credit union loans. The Director Defendants must conduct the performance of their duties for the mutual benefit and general welfare of its members with the earnings, savings, benefits, and services being distributed to its members, for financial and financially related services, and for an opportunity for its members to improve their economic and social conditions.

**B.     VANTAGE BREACHES ITS STATUTORY DUTIES**

32.    Through the conduct of the Director Defendants, Vantage breaches its duty to act honestly and lawfully when making motor vehicle loans to members.

33.    Specifically, Vantage enters into secret written agreements ("Dealer Agreement") with various auto dealers ("Vantage Dealers"). These Dealer Agreements provide that Vantage shall have complete discretion over the interest rate to be charged to members.  Specifically, Vantage provides the Dealer with a "Buy Rate" based on the member's credit qualifications and a Maximum Sell rate which is the highest interest rate that Vantage will allows the Dealer to charge a particular member.  The Dealer Agreement also provides Vantage Dealers specific authority to inflate the interest rate above the Buy Rate approved and offered by Vantage before presenting the inflated interest rate to the Vantage member. The profit generated through this practice is then divided between Vantage and the Vantage Dealer pursuant to the terms of the secret Dealer Agreement.

34.    The interest rate that is initially determined based upon the loan term and the credit qualifications of the member is commonly known and referred to in the industry as the "Buy Rate."  In other words, this is the rate at which the credit union will write the loan.  It is also the interest rate that is provided to a member who obtains a loan directly through the credit union.

35.    Vantage also calculates the "Maximum Sell Rate" which is the highest interest rate that it will approve for any particular loan.

36.    When the Buy Rate is secretly increased through a Dealer Agreement, the marked-up or inflated rate is known as the "Sell Rate" or "Contract Rate."  In other words, this is the interest rate set forth in the final contract.

37.    The monetary difference between the "Buy Rate" and the "Sell Rate," calculated

over the duration of the loan generates additional profit which is commonly known as and referred to in the industry as the "Dealer Reserve."

38.     Vantage Dealer Agreements allow the Buy Rate approved by Vantage to be artificially inflated in order to generate the Dealer Reserve, which is then divided between Vantage and the Vantage Dealer as set forth in the Vantage Dealer Agreements.

39.     The damage caused by Vantage's Dealer Reserve practice is substantial.  For example, a six-year loan on a $30,000 vehicle this is marked up by 3 percentage points has the following results:

Sell Rate of 7% =  $6,825.87 interest

Buy Rate of 4% =  $3,793.49 interest

Dealer Reserve =  $3,032.38

The member in this example would pay over $3,000 more in interest over the life of the loan because of Vantage's secrete Dealer Reserve practice.  The Dealer Reserve ($3,032.38) is then divided between Vantage and its Dealer pursuant to the terms of its Dealer Agreement.

40.     Despite the obvious harm this practice does to its members, Vantage never discloses to its members who finance their vehicle purchases through a Vantage Dealer that the members could have obtained a lower interest rate by going directly to Vantage for financing or by negotiating for a lower rate with the dealer Vantage never discloses the Buy Rate approved for its members and it fails to disclose that it offers better interest rates to Vantage members who obtain financing directly through Vantage.

41.     Vantage collects hundreds or thousands of dollars more in interest over the life of its members' loans than it would have made on loans given at the lower Buy Rate.  Essentially, Vantage uses its Vantage Dealers to enable it to charge interest rates above what it could provide

to members directly.

42.     Due to the secrecy of Vantage's Dealer Agreements with participating Vantage Dealers, most Vantage members remain completely unaware that the interest rate presented by the Vantage Dealer was arbitrarily increased above the Buy Rate such that the rate presented to them is NOT based upon their credit qualifications.

43.     Vantage and the Director Defendants' concealment of the Buy Rate from its Members is done with reckless indifference for its members right to obtain an interest rate based on their credit qualifications instead of an inflated Sell Rate designed to harm the member for the purpose of generating Dealer Reserve.

**C.    Plaintiff's 2012 Dodge Challenger Purchase**

44.     On or about December 5, 2013, Plaintiff Twanna Henry purchased a 2012 Dodge Challenger from Defendant Honda of Frontenac located in St. Louis, Missouri.

45.     Honda of Frontenac was a Vantage Dealer who has entered into a Dealer Agreement with Vantage.

46.     Plaintiff filled out a credit application at Honda of Frontenac which was sent to Vantage for approval.

47.     Plaintiff became a member of Vantage before the loan could be approved or funded.

48.     Based on the loan term and her credit qualifications, Vantage approved Plaintiff for financing at a Buy Rate *below* 10.08% over a 72-month installment period and conveyed this loan approval to the Dealer before the loan documents were created.

49.     Neither Vantage nor Honda of Frontenac disclosed to Plaintiff the material fact that she had been approved by Vantage at a lower interest rate than the one presented to her.

50.     Through the date of filing this Complaint, Vantage has refused to produce any documentation related to the actual Buy Rate for which Plaintiff was approved. Based on information and belief and Plaintiff's credit qualifications and the rates available during the time of her auto purchase, Plaintiff believes that her interest rate was inflated by more than 2%.

51.     Unbeknownst to Plaintiff, Vantage also approved a Maximum Sell Rate, which is the upper limit of how much Vantage would allow the Vantage Dealer to increase the interest rate.  Plaintiff believes that the Maximum Sell Rate set by Vantage for her loan was 10.08%.

52.     Allowing the Vantage Dealer to inflate Plaintiff's Buy Rate to 10.08%, generated Dealer Reserve which was divided between Vantage and Honda of Frontenac pursuant to the terms of the Vantage Dealer Agreement.

53.     Instead of informing Plaintiff that Vantage had approved the financing of her vehicle at a lower Buy Rate, Honda of Frontenac presented Plaintiff with loan documents showing that Vantage was the lender and that her Vantage loan was approved at the interest rate of 10.08%.

54.     On or around December 5, 2013, Plaintiff executed the Retail Installment Contract and Security Agreement with Defendant Honda of Frontenac which named Vantage as the immediate assignee and the lender.

55.     This contract did two things. First, it gave Vantage the same rights Honda of Frontenac had under the Retail Installment Contract and Security Agreement between Honda Frontenac, including the right to collect the loan payments from Plaintiff, which Vantage proceeded to do. But the assignment also meant that Vantage became obligated to perform all of Honda of Frontenac's duties created by the Retail Installment Contract and Security Agreement including refraining from engaging in unlawful and deceptive practices and contracting in good

11

faith.

56.     Vantage's acceptance of the assignment constituted an affirmative promise by Vantage to perform Honda of Frontenac's contractual duties.

57.     The UCC applies to the assignment of sales agreements that occur in Missouri like the one here. Section 400.2-210(5) provides that "[a]n assignment ... is a delegation of performance of the duties of the assignor and its acceptance by the assignee constitutes a promise by him to perform those duties. This promise is enforceable by either the assignor or the other party to the original contract." § 400.2-210(5). Moreover, the UCC favors the free assignability and delegation of rights and duties in sales agreements except where the rights and duties of the contracting parties are significantly altered or their "chance of obtaining return performance" materially diminished. § 400.2-210(2).  Accordingly, Vantage stands "in the shoes" of Honda of Frontenac and is liable under the assignment provision and under the FTC Holder Rule for any claims or defenses that Plaintiff could assert against Honda of Frontenac. *See Heinz v. Driven Auto Sales, LLC,* 603 S.W.3d 890, 896–97 (Mo. App. W.D. 2020).

58.     Thus, Vantage is subject to MMPA claims as Honda of Frontenac's assignee, for the unfair and deceptive act of concealing the buy rate that Plaintiff was actually approved for and surreptitiously marking up the interest rate to generate additional profits. *See Heinz v. Driven Auto Sales, LLC,* 603 S.W.3d 890, 896–97 (Mo. App. W.D. 2020).

59.     Plaintiff executed the loan documents not knowing that Vantage had actually calculated a lower Buy Rate for her loan based upon her credit qualifications.  She would not have agreed to the interest rate presented to her had she known that she was actually approved at a lower rate.

60.     Over the course of the loan term, the increased interest rate will result in Plaintiff

paying thousands of dollars worth of interest in excess of what she would have paid to finance her motor vehicle if it had been financed at the Buy Rate.

61.     As a direct and proximate result of Vantage's surreptitious markup of the lower Buy Rate for which Plaintiff was approved, Plaintiff sustained an ascertainable monetary loss in the amount of the additional interest she paid over the life of the loan (which is equal to the "Dealer Reserve").

62.     Although Vantage has a statutory duty to "provide for the mutual benefit and general welfare of its members," though its "financial and financially related services," Vantage breached these statutory duties by charging members interest rates above the Buy Rate that they qualified for, by failing to  disclose the existence of a lower Buy Rate approved by Vantage for Plaintiff and the class, and through its practice of incentivizing  Vantage Dealers to increase interest rates for the purpose of generating Dealer Reserve while knowingly and intentionally causing financial harm to Vantage members.

63.     Vantage took no steps to require the dealer to disclose the Buy Rate offered to Plaintiff and took no steps to directly disclose the Buy Rate itself.

64.     In or around July, 2020, after Vantage refused to provide documentation on her Buy Rate, Plaintiff discovered for the first time that Vantage approved her for a Buy Rate that was lower than the of 10.08% interest rate set forth in her contract, causing her to suffer an ascertainable economic loss equal to the difference in interest paid between the Buy Rate she was approved for and the 10.08% contract rate.

65.     Plaintiff would not have financed through Vantage at Honda of Frontenac had she known that her interest rate would be higher as a result.

66.     The acts and omissions of Vantage and the Director Defendants did not provide

13

any benefit to its membership as a whole that would justify their behavior. There is no justification for charging higher interest rates to some members over others with the same credit qualifications.

67. The damages caused to Plaintiff by Vantage and the Director Defendants was an injury that Plaintiff could not have avoided because Vantage and the Director Defendants intentionally conceal their Buy Rate information from her at the time of the transaction and they continue to conceal that information to this day. Despite several requests, Vantage has refused to provide the documentation showing the Buy Rate she qualified for based upon her credit qualifications.

68. The conduct of Vantage and the Director Defendants violates public policy, is immoral, unethical, and oppressive in its persistent misrepresentations of the interest rate for which Plaintiff and other Vantage members were actually approved when obtaining financing through a Vantage Dealer. By presenting the consumer-member with documents that identify Vantage as the lender and providing financing but with a marked-up interest rate, Vantage and its Dealers make it appear that Vantage has set the higher interest rate being presented as the interest rate that she qualified for based on her credit qualifications. Vantage hid the material fact that Vantage actually approved the transaction at a lower interest rate and that it then incentivized the dealer to increase the interest rate before presenting it to Vantage's own member, resulting in a likelihood of confusion or misunderstanding as to the source, sponsorship and approval of the interest rate presented to Plaintiff.

## CLASS ACTION ALLEGATIONS

69. Plaintiff seek to bring this case as a class action, pursuant to Rule 23 of the Federal Rules of Procedure. The proposed class (the "National Class") is defined as follows:

All Vantage Credit Union members who financed a vehicle through Vantage and a Vantage Dealer, and whose Buy Rate was lower than their Contract Rate.

## **Statute of Limitations**

70.    Active Concealment Tolling: Any statutes of limitations are tolled by Defendants knowing and active concealment of the facts outlined herein.  Defendants kept Plaintiff and the class members ignorant of vital information essential to the pursuit of these claims, without any fault or lack of diligence on Plaintiff's or the class members' part. The details of Defendants' efforts to conceal its above-described unlawful conduct—including its failure to disclose the Buy-Sell Rate discrepancy—are in their possession, custody, and control, to the exclusion of Plaintiff and the class members.  Plaintiff and the class members could not have reasonably discovered these facts or the fact that Defendants concealed these facts.

71.    Estoppel: Defendants were and are under a continuous duty to disclose to Plaintiff and the class members the Buy and Sell Rates. At all relevant times, and continuing to this day, Defendants knowingly, affirmatively, and actively concealed these facts.  The details of Defendants' efforts to conceal their above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiff and the class members. Plaintiff and the class members reasonably relied upon Defendants to provide them this information, and therefore Defendants are estopped from relying on any statutes of limitation in defense of this action.

72.    Equitable Tolling: Defendants took active steps to conceal and misrepresent material facts related to their unlawful conduct, including the difference between the Buy and Sell Rates. The details of Defendants' efforts are in its possession, custody, and control, to the exclusion of Plaintiff and the class members.  When Plaintiff learned about the Buy-Sell Rate discrepancy, they exercised due diligence by thoroughly investigating the situation, retaining

counsel, and, now, pursuing their claims. Should such tolling be necessary, all applicable statues of limitation should be tolled under the doctrine of equitable tolling.

73.    <u>Discovery Rule</u>: The statute of limitations is tolled for Plaintiff's negligence, Missouri Merchandising Practices Act, and unjust enrichment causes of action under Mo. Ann. Stat. § 516.120(5). Subsection (5) provides that, in "[a]n action for relief on the ground of fraud, the cause of action [is] deemed not to have accrued until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud." When subsection (5) applies, "a claim of fraud also has a five-year limit, but it begins to run only upon 'the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud.' " *Klemme v. Best,* 941 S.W.2d 493, 497. The Supreme Court of Missouri applies the plain and ordinary meaning to the term "fraud" in § 516.120(5); thus, a claim of constructive fraud is governed by § 516.120(4), a subsection to which the capable-of-ascertainment standard applies. *Id.* at 496–97; *see Koester v. Am. Republic Inv., Inc.,* 11 F.3d 818, 821–22 (8th Cir.1993). Use of "fraud" in connection with the sale of merchandise is one of the unlawful practices enumerated in § 407.020(1) of the MMPA.

74.    When Plaintiff executed her Retail Installment Contract and Security Agreement, Defendants did not disclose to her that she had been approved for an interest rate below 10.08% or that her interest rate had been marked up to create Dealer Reserve that would be split between Honda of Frontenac and Vantage, there was no way for her to know this. Thus, Plaintiff's MMPA claim, negligence, and unjust enrichment claims are based in common law fraud under §516.120(5).

75.    Thus, Defendants are stopped from asserting any statute of limitation defenses that might otherwise be applicable to the claims asserted herein.

16

## Rule 23(a) Criteria

76.    **Numerosity.** The exact number of Class members is unknown as such information is in the exclusive control of Defendants. However, due to the nature of the trade and commerce involved, Plaintiff believes the Class consists of easily over 1,000 consumers geographically dispersed throughout the United States and within the state of Missouri, making joinder of all Class members impracticable. Details of the exact number of motor vehicle loans financed by Vantage resulting in a Dealer Reserve will be available through Defendant Vantage's business records and computer files.

77.    **Commonality.** Common questions of law and fact affect the right of each Class member and common relief by way of damages is sought for Plaintiff and Class members. The harm that Defendants have caused or could cause is substantially uniform with respect to Class members. Common questions of law and fact that affect the Class members include, but are not limited to:

        a.    Whether Vantage's practice of contracting with Vantage Dealers for the express purpose of surreptitiously increasing the interest rate charged to its members in vehicle purchases for the purpose of creating additional hidden profit violates Vantage's statutory duty to act honestly and lawfully in conducting the business of the credit union;

        b.    Whether Vantage's practice of contracting with Vantage Dealers, like Honda of Frontenac for the express purpose of surreptitiously increasing the interest rates charged to its members in vehicle purchases for the purpose of creating additional hidden profit violates the Missouri Merchandising Practices Act;

      c.      Whether Plaintiff and the class members were harmed by Vantage and the Director Defendants' practices;

      d.      Whether Vantage was unjustly enriched by its practices;

      e.      Whether Plaintiff and the class members are entitled to damages; and

      f.      Whether Plaintiff and the class members are entitled to restitution, injunctive, or other equitable relief.

78.    **Typicality.** The representative Plaintiff's claims are typical of the claims of the Class because Plaintiff and all class members sustained damages arising out of Defendants' standard practice of conspiring with Vantage Dealers to inflate the interest rates charged to members in order to generate Dealer Reserve which it then shares with the Vantage Dealers. Standardized Dealer Agreements are used between Vantage and its Dealers and standard approval forms are used which detail the Buy Rate and Maximum Sell Rate.

79.    **Adequacy of Representation.** Plaintiff will fully and adequately protect the interests of the class members. Plaintiff has retained counsel who are experienced in class action litigation and are competent to successfully prosecute this action. Plaintiff does not have any interest contrary to or in conflict with the class members she seeks to represent.

## Rule 23 (b) Criteria

80.    Questions of law and fact predominate over any questions affecting only individual members, and Defendants have acted on grounds applicable to all class members. A class action provides a fair and efficient method for the adjudication of this controversy for the following reasons which is superior to the alternative methods involved in individual litigation:

      a.      Although the specific amount of the Dealer Reserve differs for each transaction, each individual transaction can be easily determined through a simple review of

the Vantage documents showing the Buy Rate and Sell Rate. On information and belief, Vantage tracks Dealer Reserve directly and can determine damages for each class member through simple reports generated by its software.

    b.   The Class is so numerous as to make joinder impracticable. However, the Class is not so numerous as to create manageability problems. There are no unusual legal or factual issues that would create manageability problems. Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications against Defendants when confronted with incompatible standards of conduct.

    c.   Adjudications with respect to individual members of the Class could, as a practical matter, be dispositive of any interest of other members not parties to such adjudications, or substantially impair their ability to protect their interests; and

    d.   Despite the costly nature of the fees charged to Plaintiff and Class members, the claims of the individual Class members are, nevertheless, small in relation to the expenses of individual litigation, making a Class action the only procedural method of redress in which Class members can, as a practical matter, recover.

81.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. In fact, Vantage and the Director Defendants' practice of hiding the true Buy Rate from its members and not disclosing its Dealer Agreements makes it unlikely that many class members are even aware that their interest rate was subject to change by the Vantage Dealer. Without a class action, the vast majority of the class will never know about the practices complained of herein. There are no difficulties involved in this action that would cause

the intractable management issues that would preclude this action from proceeding to trial as a class action.

**COUNT I**
**NEGLIGENCE**
**Against Vantage and Director Defendants**

82.     Plaintiff re-alleges and incorporates paragraphs 1 through 78 as if fully set forth herein.

83.     Missouri state-chartered credit unions are not-for-profit cooperatives that are owned by their members and whose primary purpose is to meet the credit and savings needs of their members.

84.     As a State-Chartered Credit Union, Vantage and its Directors are governed by the Missouri Credit Union Act, Mo. Ann. Stat. Chapter 370, and Vantage's bylaws, which are the applicable rules and regulations governing the duties and obligations of Missouri chartered not-for-profit credit union associations and their Directors.

85.     Pursuant to the Missouri Credit Union Act, the Director Defendants have specific statutorily imposed duties:

> **Sec. 370.005. Definitions**
> (1) "Credit union", a not-for-profit corporation organized for the purposes of encouraging thrift among its members, creating a source of credit at a fair and reasonable rate of interest, **providing for the mutual benefit and general welfare of its members with the earnings, savings, benefits, and services being distributed to its members, for financial and financially related services, and for an opportunity for its members to improve their economic and social conditions.** (emphasis added)
>
> **370.200. Duties of board — telephone or electronic participation at meetings.** — 1. **The board of directors shall have the general management of the affairs, funds, and records of the corporation**, and unless they shall be specifically reserved to the members or delegated to the president or operating manager, it shall be the special duty of the directors:
>     (1) To act upon applications for membership in the credit union;
>     (2) To determine, from time to time, rates of interest which shall be charged

20

on loans;

    (3)  To fix the maximum number of shares which may be held by and the maximum amount, both secured and unsecured, which may be loaned to any one member, such limitations to apply alike to all members; and

    (4) To have charge of the investment of funds of the credit union, other than loans to members, and to perform such other duties as the members may, from time to time, authorize.

    2. Additionally, the board shall have the duty to:

    (1) Authorize the employment and compensation of the chief executive officer;

    (2) Approve an annual operating budget for the credit union;

    (3) Declare dividends on regular shares;

    (4) Accept and act upon resignations and determine and fill vacancies on the board of directors, credit committee, and, if the bylaws so provide, the supervisory committee until the election or appointment of qualified successors;

    (5) Amend the bylaws except for those provisions in other sections of this chapter specifically reserved for membership action; and

    (6) Consider an appeal of a person denied membership by the credit union.

(emphasis added)

86.    This statute creates a duty to operate the credit union for the mutual benefit and general welfare of Vantage's members and to provide an opportunity for Vantage's members to improve their economic and social condition.

87.    Vantage and the Director Defendants enter into Dealer Agreements for the express purpose of inflating the interest rates charged to their members above the Buy Rate that is calculated by the credit union based upon the loan term and the credit qualifications of the member.  The purpose of inflating the Buy Rate is to generate additional profit in the form of Dealer Reserve, which is then divided between Vantage and the Dealer.

88.    Although Vantage and the Director Defendants know that this practice causes harm to their members, Vantage and its Directors do not disclose to its members its Dealer Reserve practices.

89.    In fact, Vantage's website represents to its members that they will get the same rate at one of its Vantage Dealers that they would get if they come directly to the Credit Union.

This is a false statement.

90.    As a direct and proximate result of the breach of Vantage and its Directors'
statutory duties as described herein, Plaintiff and other similarly situated members have suffered
economic loss and damages.

91.    Plaintiff and the Class asserts this claim under the Missouri Credit Union Act,
Mo. Ann. Stat. Chapter 370 and the common law of negligence only, and asserts no claims or
challenges to the auto purchase agreements or retail installment contracts between the dealer and
the member.  Plaintiff and the Class seek no recovery from any auto dealer and do not seek to
invalidate any portion of any auto purchase agreement through this claim.

## COUNT II
### Violations of Missouri Merchandising Practices Act
### Mo. Ann. Stat. § 407.020
### Against Defendant Vantage and Honda of Frontenac

92.    Plaintiff and the Class re-allege and incorporate paragraphs 1 through 78 as if
fully set forth herein.

93.    Plaintiff brings this claim individually and on behalf of the Class for violations of
the MMPA. The MMPA "is designed to regulate the marketplace to the advantage of those
traditionally thought to have unequal bargaining power as well as those who may fall victim to
unfair practices." *Huch v. Charter Commc'ns Inc.*, 290 S.W. 3d 721, 725 (Mo. banc. 2009). The
MMPA provides that it is unlawful to "act, use or employ . . . deception, fraud, false pretense,
false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of
any material fact in connection with the sale or advertisement of any merchandise in trade or
commerce . . . ." Mo. Ann. Stat. §407.020.

94.    Pursuant to 15 C.S.R. 60-9.020, Deception in General, it is an unlawful act to use
"any method, act, use, practice, advertisement or solicitation that has the tendency or capacity to

22

mislead, deceive or cheat, or that tends to create a false impression."

95.    Pursuant to 15 C.S.R. 60-9.040, Fraud in General, it is an unlawful act to use "any acts, omissions or artifices which involve falsehood, deception, trickery, breach of legal or equitable duty, trust, or confidence, and are injurious to another or by which an undue or unconscientious advantage over another is obtained."   Further, "Fraud, as used in section 407.020.1, RSMo is not limited to common law fraud or deceit and is not limited to finite rules, but extends to the infinite variations of human invention." 15 C.S.R. 60-9.040(2).

96.    Pursuant to 15 C.S.R. 60-9.070, Misrepresentation in General, a "misrepresentation"—and therefore an unlawful act pursuant to 407.020.1 RSMo.—"is an assertion that is not in accord with the facts."

97.    Pursuant to 15 C.S.R. 60-9.090, Half-Truths, it is "a misrepresentation"—and therefore an unlawful act pursuant to 407.020.1 RSMo.—"for any person in connection with the advertisement or sale of merchandise to omit to state a material fact necessary in order to make statements made, in light of the circumstances under which they are made, not misleading."

98.     Pursuant to 15 C.S.R. 60-9.110, Concealment, Suppression or Omission of Any Material Fact in General, "Concealment of a material fact is any method, act, use or practice which operates to hide or keep material facts from consumers," "Suppression of a material fact is any method, act, use or practice which is likely to curtail or educe the ability of consumers to take notice of material facts which hare stated," and "Omission of a material fact is any failure by a person to disclose material facts known to him/her, or upon reasonable inquiry would be known to him/her."

99.    The elements of a claim under the MMPA are: (1) the purchase of goods or services, (2) primarily for personal or household purposes; and (3) an ascertainable loss of

money or property, (4) as a result of, or caused by, the use or employment by another person of a method, act, or practice declared unlawful under the MMPA. §§ 407.020 and 407.025.1. *Hawkins v. Nestle U.S.A. Inc.*, 309 F. Supp. 3d 696, 701 (E.D. Mo. 2018); *See also Murphy v. Stonewall Kitchen, LLC,* 503 S.W.3d 308, 311 (Mo. App. E.D. 2016); and Mo. Approved Instructions (Civil) 39.01(7th ed.).

100.    On or around December 5, 2013, Honda of Frontenac sent a credit application for Plaintiff to Vantage seeking loan approval for the purchase of the 2012 Dodge Challenger.

101.    Shortly thereafter, Vantage approved a loan to Plaintiff for her chosen vehicle and provided Honda of Frontenac with a Buy Rate based on her credit qualifications and a max sell rate limiting how high the interest rate could be inflated for Plaintiff's transaction.

102.    With the approval from Vantage, Honda of Frontenac presented Plaintiff with loan documents showing her loan was approved by Vantage at an interest rate of 10.08%. Neither Vantage nor Honda of Frontenac disclosed to Plaintiff that her loan was actually approved for an interest rate below 10.08%.

103.    That same day, Plaintiff executed the Retail Installment Contract and Security Agreement with Defendant Honda of Frontenac, which simultaneously assigned all duties and obligations under the Retail Installment Contract and Security Agreement between Honda of Frontenac and Plaintiff to Vantage.

104.    After executing that paperwork, Plaintiff made one or more payments on the Retail Installment Contract and Security Agreement.  Accordingly, Plaintiff purchased the 2012 Dodge Challenger. *Fugate v. Jackson Hewitt, Inc.*, 347 S.W.3d 81, 85-86 (Mo. App. W.D. 2011)

105.    The vehicle purchases of Plaintiff and class members were for goods used for personal, family or household purposes under the MMPA.

106.    The assignment did two things. First, it gave Vantage the same rights Honda of Frontenac had under the Retail Installment Contract and Security Agreement between Honda Frontenac, including the right to collect the loan payments from Plaintiff, which Vantage proceeded to do. But the assignment also meant that Vantage became obligated to perform all of Honda of Frontenac's duties created by the Retail Installment Contract and Security Agreement including refraining from engaging in unlawful and deceptive practices and contracting in good faith.

107.    Vantage's acceptance of the assignment constituted an affirmative promise by Vantage to perform Honda of Frontenac's duties under the contract which included providing disclosure of the fact that Plaintiff was approved for a buy rate that was lower than 10.08%.

108.    The UCC applies to the assignment of sales agreements that occur in Missouri like the one here. Section 400.2-210(5) provides that "[a]n assignment ... is a delegation of performance of the duties of the assignor and its acceptance by the assignee constitutes a promise by him to perform those duties. This promise is enforceable by either the assignor or the other party to the original contract." § 400.2-210(5). Moreover, the UCC favors the free assignability and delegation of rights and duties in sales agreements except where the rights and duties of the contracting parties are significantly altered or their "chance of obtaining return performance" materially diminished. § 400.2-210(2); *Heinz v. Driven Auto Sales, LLC,* 603 S.W.3d 890, 896–97 (Mo. App. W.D. 2020).

109.    Thus, Vantage is subject to MMPA claims as Honda of Frontenac's assignee, for the unfair and deceptive act of concealing the lower buy rate that Plaintiff was actually approved for and instead marking up her interest rate to generate additional undisclosed profit in the form of Dealer Reserve. *See Heinz v. Driven Auto Sales, LLC,* 603 S.W.3d 890, 896–97 (Mo. App.

W.D. 2020).

110.     By presenting Plaintiff and class members with documents that identify Vantage as the lender providing financing and the marked-up interest rate, Vantage and its Vantage Dealers cause the member to believe that the interest rate being presented to them is the interest rate that was calculated by Vantage based upon their credit qualifications.  In reality, the rate being presented to the member has been marked up by the Vantage Dealer for the express and stated purpose of generating Dealer Reserve to be divided between Vantage and the Vantage Dealer without the member's knowledge.  This conduct constitutes the act, use or employment of deception, fraud, false pretenses, false promises, misrepresentation, unfair practices and/or the concealment, suppression, or omission of any material facts in connection with the sale or advertisement of any merchandise in trade or commerce in violation of the MMPA because Plaintiff and Class members believe that the interest rate is based upon their credit qualifications and not on a secret agreement between Vantage and the Vantage Dealer, including Honda of Frontenac.

111.     Vantage and Honda of Frontenac's misrepresentations and omissions as set forth in this Complaint are material in that they relate to matters that are important to Plaintiff and Class members' and/or are likely to affect the purchasing decisions or conduct of consumers, including Plaintiff and Class members.

112.     Vantage and Honda of Frontenac's MMPA violations, as described herein, have directly and proximately resulted in an ascertainable monetary loss to Plaintiff and class members, equal to the amount of additional interest paid on their loans above the Buy Rate, i.e., the Dealer Reserve. Had Plaintiff and members of the Class known that they had qualified for a lower interest rate than they were charged, they would not have financed at Honda of Frontenac

or would have purchased the vehicle on different terms.

113. Plaintiff acted as a reasonable consumer would in light of all circumstances.

114. Defendants' concealment of the Buy-Sell Rate difference would cause a reasonable person to enter into the transaction that resulted in the damages claimed herein; in the alternative, had Defendants disclosed the hidden markup, a reasonable person would not have entered into the transaction.

115. The damages of Plaintiff and the class members are readily proven by sufficiently definitive and objective evidence, such that their respective losses are calculable with a reasonable degree of certainty.

116. Plaintiff and class members seek their attorney fees and costs pursuant to Mo. Ann. Stat. § 407.025.

**COUNT III**
**Unjust Enrichment**
**On behalf of Plaintiff and the Class, against Defendant Vantage**

117. Plaintiff and the class re-allege and incorporate paragraphs 1 through 78 as if fully set forth herein.

118. The essential elements of unjust enrichment are: (1) the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; and (3) that it would be unjust to allow the defendant to retain that benefit. *Cent. Parking Sys. of Mo., LLC v. Tucker Parking Holdings, LLC*, 519 S.W.3d 485, 498 (Mo. App. E.D. 2017), quoting *Holliday Inv., Inc. v. Hawthorn Bank*, 476 S.W.3d 291, 295 (Mo. App. W.D. 2015).

119. Plaintiff and the class members obtained financing from Vantage for the purchase of their motor vehicles.

120. Vantage internally approved Plaintiff and the class members for particular interest

27

rates/APRs on their motor vehicle loans.

121.    Without disclosing it to Plaintiff and the class members, Vantage worked with the auto dealers from whom Plaintiff and the class members purchased their cars to surreptitiously inflate the interest rates/APRs on the motor vehicle loans before presenting the terms of the loans to Plaintiff and the class members.

122.    As a result of Vantage's secret Dealer Agreements with Vantage Dealers to share Dealer Reserves, Plaintiff and the class members were forced to pay higher interest rates for their motor vehicle loans than Vantage internally approved them for.

123.    As a result of the higher interest rates, Plaintiff and the class members' periodic payments were higher than they otherwise would be.

124.    Vantage retained monetary benefits due to the inflated interest rates it imposed on Plaintiff and the class members. Vantage received and retained these benefits to the detriment of Plaintiff and the class members.

125.    It would be unjust for Vantage to retain the monetary benefits obtained from Plaintiff and the class members because they were obtained through unjust deception and trickery.

126.    Plaintiff and the class members are entitled to restitution of the money paid to Vantage as additional interest over and above the Buy Rate as a result of its acts and omissions described herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the class, prays for judgment as follows:

A.    An order certifying this case as a class action;

B.    An order appointing Plaintiff as class representative and her counsel as class

counsel;

C.      An order awarding damages, including all special, incidental, and statutory, as

allowed by law, to Plaintiff and the class members;

D.      An order of attorneys' fees and expenses as permitted by law;

E.      Such other further relief at law or in equity as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

**PLAINTIFF HEREBY DESIGNATES ST. LOUIS AS PLACE OF TRIAL.**

Respectfully submitted,

*/s/ Bryce B. Bell*
Bryce B. Bell  66841(MO)
Bell Law, LLC
2600 Grand Blvd., Suite 580
Kansas City, MO 64108
T: 816-886-8206
F: 816-817-8500
Bryce@BellLawKC.com

Janet Varnell   (*pro hac vice* forthcoming)
Matthew Peterson (*pro hac vice* forthcoming)
Varnell & Warwick
1101 E. Cumberland Ave., Suite 201H, # 105
Tampa, FL 33602
T: 352-753-8600
F: 352-504-3301
jvarnell@varnellandwarwick.com
mpeterson@varnellandwarwick.com

E. Michelle Drake (*pro hac vice* forthcoming)
Joe Hashmall (*pro hac vice* forthcoming)
Berger Montague, PC
43 SE Main Street, Suite 505
Minneapolis, MN 55414
T: 800-424-6690
emdrake@bm.net